1  Erik L. Jackson SBN No. 166010
2  ejackson@cozen.com
   COZEN O'CONNOR
3  601 S. Figueroa Street, Suite 3700
4  Los Angeles, CA  90017
   Telephone: 213.892.7900
5  Facsimile: 213.892.7999

6  Attorneys for Plaintiff Energy
7  Management Collaborative, LLC

8
              **UNITED STATES DISTRICT COURT**
9
         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
10

11 ENERGY MANAGEMENT                    Case No.
12 COLLABORATIVE, LLC, a Minnesota      **PLAINTIFFS' COMPLAINT FOR:**
   Limited Liability Company,
13                                        **(1)  BREACH OF CONTRACT;**
14              Plaintiff,                **(2)  BREACH OF COVENANT OF
                                         GOOD FAITH AND FAIR
15 v.                                    DEALING;**
16                                        **(3)  DECLARATORY RELIEF;**
   DARWIN TECH LLC, a California
17 limited liability company, JASON      **(4)  FRAUD;**
   WHITNEY, an individual, and DOES
18 1-100, as follows,                    **(5)  CONVERSION**
19                                        **(6)  UNJUST ENRICHMENT**
              Defendants.
20                                       **DEMAND FOR JURY TRIAL**
21
22
23
24      Plaintiff Energy Management Collaborative, LLC ("EMC") respectfully
25 complains against Defendants Darwin Tech, LLC ("DT") and Jason Whitney
26 ("Whitney"), as follows:
27
28

                              1

**NATURE OF ACTION**

1.      This is an action for breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, fraud, conversion and unjust enrichment brought by Plaintiff Energy Management Collaborative, LLC ("EMC") against Defendants Darwin Tech LLC ("DT") and Jason Whitney.  (EMC, DT, and Whitney are sometimes collectively referred to as "the Parties").

2.      EMC is a successful company with a long track record of success, including the delivery of retrofit energy-efficient lighting for Fortune 1000 companies in North America and inventing an IoT smart-lighting product called the Emergency Lighting Testing System (ELTS), which autonomously performs various code-required tests of emergency lighting. The ELTS is a system that includes a field-installed component, and a server-based component (collectively, the "Product").  The Product is an innovation made by EMC and would be the first of its kind in the lighting industry. EMC's customers have been eagerly awaiting the Product and would have purchased the Product if it were available on the market.

3.      In or about April 2020, EMC met with DT to discuss retaining DT to assist EMC to help engineer a product and obtain all required certifications.  In furtherance of its request, in May 2020 EMC provided an RFP package to DT that expressly states, *inter alia*, that DT would need to obtain FCC certification and UL Listing for the product to be engineered as part of the process.  DT and Whitney represented themselves to EMC as having a successful business that provides electrical, mechanical, firmware, program management, manufacturing, and engineering services for the design and manufacture of connected products in the consumer, industrial and medical electronics space, including, *inter alia*, experts in obtaining UL Listing certifications.  DT and Whitney also represented themselves as experts in obtaining UL Listings for their clients and that they had a long track record of quickly and efficiently obtaining UL Listings.

4.      Relying on Defendants' representations, EMC, in or about July 2020,

entered into a contract with DT entitled Master Design and Development Services Agreement ("MSA").  Pursuant to the MSA, DT promised to, *inter alia*, reduce EMC's invention to practice for EMC while meeting EMC's specifications, including developing hardware, firmware, and a server-based component, to obtain all necessary certifications including UL listing, as well as other related deliverables as part of a system.

5.      EMC advised Defendants on numerous occasions that the system and deliverables were needed because EMC had a large and growing number of potential customers eager to purchase the finished product.

6.      As noted, EMC advised Defendants on numerous occasions that certification to applicable standards, particularly UL listing, was of critical importance for the Product to be marketable, and Defendants promised to obtain all needed certifications.

7.      DT was required to communicate on a regular basis with EMC about all aspects of its progress.  If DT could not create the system, firmware and/or other deliverables, DT was required to immediately notify EMC so that EMC could act to ensure the creation of the system, firmware and other deliverables without delay.

8.      EMC fully complied with its obligations under the MSA, including, *inter alia,* paying DT in excess of $750,000 to date for DT's services and nearly $1,500,00 in total payments for manufacturing setup and initial production runs, and has otherwise fully complied with its obligations under the Agreement.

9.      DT was never able to create or deliver the Product or obtain UL listing for the Product, including*, inter alia,* developing hardware and firmware meeting EMC's specifications, and other deliverables promised in the MSA.  Nor did DT timely communicate the status of the project (including non-compliance with applicable UL product testing) to EMC, or ever advise EMC that it could not create the product or deliverables under the MSA or otherwise comply with its obligations under the MSA.  Instead, DT continuously strung EMC along, all the while seeking

3

1  and accepting substantial further payments from EMC.  Defendants' conduct in this

2  regard was willful.

3  10.  Once EMC realized that due to Defendants' willful misconduct that DT

4  would not be able to comply with the terms of the MSA, despite DT's ongoing

5  misrepresentations and attempts to obfuscate the truth, EMC demanded that DT turn

6  over the firmware source code, circuit-board design files, and other deliverables so

7  that EMC could try to salvage its relationships with its customers and potential

8  customers by completing the development of the Product  with competent assistance.

9  DT refused to turn over the firmware source code and other deliverables unless EMC

10  would agree to enter into a new manufacturing agreement between the Parties.  DT

11  thus not only willfully breached the MSA by refusing to turn over the materials

12  promised and paid for by EMC, but Defendants attempted to extort EMC into

13  expanding its relationship with DT in exchange for avoiding further delays and other

14  breaches of the MSA, and potentially losing EMC's customer base and potential

15  customers.

16  11.  EMC refused to give in to DT's willful breaches of the MSA and

17  Defendants' related misconduct.  DT's willful breaches of the MSA proximately

18  caused substantial compensatory damages, including over $1 million paid to DT under

19  the MSA, significant lost profits and other expenses, with contract damages totaling

20  over $2 million to date, plus prevailing party attorneys' fees.  EMC also seeks an

21  order turning over the firmware and related deliverables paid for by EMC as required

22  by the MSA.

23  12.  Defendants also defrauded EMC by, *inter alia*, misrepresenting their

24  capabilities and experience, competency and background to induce EMC to enter into

25  the MSA.  Unbeknownst to EMC, DT in truth was a very small one- or two-person

26  operation, having its business address at a small cabin located in Big Bear, California

27  and did not have the Irvine, California offices or employees represented.  In truth,

28  Defendants did not have the capabilities required to perform under the MSA.  In

addition, Defendants defrauded EMC during the course of the Parties' relationship by repeatedly misleading the status of their work and efforts and the status of the project. Had EMC known the true facts, EMC would not have entered into the MSA or continued on with the relationship once the true facts became known.

13.   By withholding the materials promised and paid for under the MSA, Defendants have converted deliverables and firmware that belong to EMC. Defendants' conduct supports significant exemplary and punitive damages.

## JURISDICTION AND VENUE

14.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a).  Plaintiff alleges compensatory damages of significantly in excess of $2 million, plus attorneys' fees, interest and exemplary and punitive damages.  EMC has expressly consented to this Court's personal jurisdiction and venue under Section 10.2 of the MSA:

> 10.2.  Venue; Submission to Jurisdiction.  Each of the Parties submits to the exclusive jurisdiction of any state or federal court sitting in Los Angeles, California for any action or proceeding arising out of or relating to this Agreement.  The Parties agree that all claims in respect of the action or proceeding may be heard and determined in any such court, and the Parties agree not to bring any action or proceeding arising out of or relating to this Agreement in any other court.

A copy of the MSA is attached hereto as Exhibit "1" (without including the Statements of Work).  MSA, Exh. 1.  In addition, EMC is a citizen of Minnesota and Defendants are citizens of California.

15.   Venue is proper in this Court under 28 U.S.C. § 1369 as EMC and DT have expressly consented to this Court's venue, Whitney is closely aligned with EMC and both Defendants reside in the Central District.

## THE PARTIES

16.   Plaintiff EMC is a limited liability company established under the laws of the State of Minnesota, with its principal place of business at 2890 Vicksburg Lane, Plymouth, Minnesota 55447.

17.     Defendant DT is a limited liability company established under the laws of the State of California, with its principal place of business at 2065 Shady Lane 1881, Big Bear City, California 92314.

18.     Defendant Whitney has represented himself as the Chief Executive Officer of DT for all relevant time periods.  Whitney is a California resident who resides, on information and belief, at 111 Pacer, Irvine, California 92618.

19.     The true names and capacities, whether individual, corporate, associate or otherwise of Defendants named herein as DOES 1 through 10 are unknown to Plaintiff, who therefore sue such Defendants by such fictitious names, and Plaintiff will amend the Complaint to show their true names, involvement, and capacities when the same have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants named herein as DOEs was in some manner responsible for the injuries and losses suffered by Plaintiff herein.

20.     At all times herein mentioned, and except as otherwise noted, each of the Defendants was the actual and apparent agent, servant and / or employee of each of the other Defendants herein, and in doing the things hereinafter alleged, was acting within the course and scope of their actual and apparent agency and employment and with the knowledge, notification, consent and subsequent ratification of each of the other Defendants herein.

21.     EMC is informed and believe and thereon alleges that Whitney and certain of the DOE Defendants are, and at all times herein mentioned were, alter egos of DT and that there exists, and at all times herein mentioned has existed, a unity of interest and ownership between these Defendants such that any separateness has ceased to exist.  EMC is informed and believes and thereon alleges that DT is and at all times herein mentioned was, the mere shell, instrumentality, and conduit through which Whitney and one or more of the DOE Defendants carried on its business in the name of DT, exercising complete control and dominance of the businesses to such an extent that any individuality or separateness of these DOE Defendants and DT does

not, and at all times herein mentioned did not exist.  EMC is informed and therein alleges that DT is and at all times herein mentioned was controlled, dominated, and operated by Whitney and these DOE Defendants as their individual business and alter ego, in that EMC is informed and believes that the activities and business of DT was carried out without, *inter alia*, the holding of directors' or members' meetings, no records or minutes of any corporate proceedings were maintained.

## GENERAL ALLEGATIONS

22.    In or about April 2020, EMC contacted DT to inquire about assisting EMC to help engineer a product and obtain all required certifications.  In furtherance of its request, in May 2020 EMC provided an RFP package to DT regarding the project that expressly states, *inter alia*, that DT would need to obtain FCC certification and UL Listing for the Product to be engineered as part of the process.  EMC also provided the RFP package to other companies who were under consideration at the time. According to the RFP: "At a minimum, the EELTS should satisfy applicable Federal Communication Commission (FCC) and UL LLC requirements so that it is certified by both agencies."

23.    DT and Whitney represented themselves to EMC as having a successful business that provides electrical, mechanical, firmware, program management, manufacturing, and engineering services for the design and manufacture of connected products in the consumer, industrial and medical electronics space, including, *inter alia*, experts in obtaining UL Listing certifications.  DT and Whitney also represented themselves as experts in obtaining UL Listings for their clients and that they had a long track record of quickly and efficiently obtaining UL Listings.

24.    The contract at issue in this case is a Master Design and Development Services Agreement to which EMC and DT are parties, dated as of July 15, 2020, and associated Statements of Work ("SOWs") and related agreements created thereunder and incorporated therein, including, inter alia: (a) SOW iOS and Android dated July 15, 2020 ("Mobile App SOW"); (b) SOW Emergency Wireless Gateway System

dated July 15, 2020 ("Base System SOW"); (c) Product Requirements Document as referenced in multiple statements of work ("PRD"); (d) SOW Flanders MVP dated April 6, 2021 ("MVP SOW"); (e) SOW ServiceChannel Integration dated April 6, 20201 ("ServiceChannel SOW"); and (f) ELT Software Requirements v.2 as incorporated into the MVP SOW ("ELT Software Requirements").

25.     Pursuant to the MSA and the associated SOWs, DT promised to design and develop Work Product to the order and specifications of EMC.  *See, e.g.*, MSA, Sec. 1-2. "Work Product" is defined in the MSA as follows:

> "Work Product" means all Deliverables and all associated intellectual property rights therein, including trade secrets, copyrights, patents or patentable information, mask works and other intellectual property rights, that (i) are conceived, developed, designed, made, or reduced to practice by Darwin Tech for EMC during the Term of this Agreement pursuant to a Statement of Work, and (ii) for which EMC has satisfied its payment obligations under the applicable Statement of Work, in each and all cases excluding Darwin Tech Intellectual Property, which is specifically not included as part of the Work Product. MSA, Sec. 1.9.

26.     Under the MSA, DT granted to EMC a perpetual, worldwide, royalty-free, non-exclusive, transferable, assignable, sublicensable license to use DT's Intellectual Property to the extent that such intellectual property is needed for EMC's use or utilization in connection with the Work Product.  MSA, Sec. 3.2. DT's Intellectual Property means intellectual property that DT may have created before the Parties entered into the MSA any intellectual property relating to the project created under the MSA belongs to EMC under the MSA. *See* MSA, Sec. 1.3

27.     Also under the MSA, DT promised to obtain all necessary certifications, including all applicable UL Listings.

28.     The MSA further requires DT to immediately notify EMC if and when it became apparent that DT could not deliver/provide final Work Product and/or Deliverables consistent with the specifications in the applicable SOW. MSA Sec. 2.1.

29.     DT created an initial product design but was not able to obtain the

promised UL Listing certification confirming completion of testing and misled EMC as to the results of the testing.

30.     Defendants repeatedly misrepresented material facts to EMC about the status of the project, including falsely representing, for multiple weeks, both orally and in writing, that the UL approval process was ongoing when in fact UL had advised DT unequivocally that it declined to evaluate the Product under the requested standard, UL924. At the same time, DT continued to invoice EMC for additional work to obtain the UL Listing that UL had previously declined to undertake.

31.     In August 2021, Whitney attended a meeting at EMC's principle place of business in Minneapolis, Minnesota on DT's behalf.  During that meeting, EMC expressed its growing displeasure over DT's inability to comply with the terms of the MSA.  EMC was becoming increasingly concerned that DT simply could not perform under the contract.  EMC was also concerned to learn about DT's undisclosed relationship with a third-party contract manufacturer based in China.  EMC demanded information about component delivery, purchase order for components, and basic contractual information regarding DT's relationship with a third-party contract manufacturer.  As DT knew, understanding the relationship with the third-party contract manufacturer is critically important to EMC to assure the intellectual property rights of its invention and the Product are protected.  DT failed to provide any information relevant to its relationship with the contract manufacturer.

32.     On or about September 2, 2021, UL advised DT in writing that it had rejected DT's request that UL evaluate the Product under UL standard 924.  DT did not advise EMC of this fact, or provide UL's letter to EMC, for over *six weeks*. Instead, DT repeatedly represented to EMC that it was continuing to work with UL towards the UL Listing.

33.     During the course of the relationship, DT provided EMC with regular weekly Status Reports.  Several of the Status Reports provided following its receipt of UL's September 2, 2021, rejection letter falsely state that UL was continuing to

evaluate the product:

**DT 9-8-21 Report** – **UL "Certification"** "UL is ongoing and will include Sub-Gig SKU"

**DT 9-15-21 Report** – **UL "Certification"** "UL is ongoing and will include Sub-Gig SKU"

**DT 9-22-21 Report** – **UL "Certification"**

- "6 weeks, $11,100 USD"

- "Need EMC to approve and provide PO if this is wanted"

- "Will require label changes to add in the UL logo"

- "UL is ongoing and will include Sub-Gig SKU"

**DT 9-29-21 Report** – **UL "Certification"**

- "6 weeks, $11,100 USD"

- "Need EMC to approve and provide PO if this is wanted"

- "Will require label changes to add in the UL logo"

- "UL is ongoing"

34.     After misleading EMC about the status of the UL certification process for weeks, DT finally turned over UL's rejection letter to EMC by email, during a conference between Whitney and EMC's principles regarding the status of the project. At that point, EMC realized that there were numerous additional issues with DT's work under the MSA that indicated that DT did not have the competency to take the product to production under the terms of the MSA.  In addition, DT repeatedly delayed and postponed compliance with its obligations under the MSA.  EMC advised DT of its intention to terminate the MSA but DT refuses to turn over, *inter alia*, the firmware source code that belongs to EMC under the terms of the MSA.  DT's failure to turn over the firmware has delayed EMC's ability to complete the product, which DT promised but proved unable to do.

35.     EMC and Whitney / DT met again at EMC's principal place of business on or around October 27, 2021.  During that meeting, EMC demanded that DT turn over all the firmware to EMC as the MSA provides that all such firmware, including any source code created by DT, belonged to EMC.  Whitney agreed that this is precisely what the MSA provides, and promised to turn over all firmware to EMC forthwith.  DT's counsel later advised EMC that DT had decided not to honor its agreement to turn over the firmware source code to EMC.

36.     Also during the October 2021 meeting, Whitney told EMC that the individuals who worked for DT were independent contractors, not employees as DT had represented prior to entering into the MSA.  EMC immediately demanded that DT provide copies of confidentiality agreements that these independent contractors had signed to protect EMC's work product.  DT and Whitney not only refused to provide any such agreements but advised that they would not disclose who the independent contractors actually were.  This issue was of particular concern to EMC because DT did not appear to have the ability to guarantee the confidentiality of EMC's intellectual property, including trade secrets and other work product that DT was creating and producing for EMC under the MSA.

37.     EMC has fully performed all its obligations under the MSA in good faith, including, *inter alia*, payment in full of more than $750,000 for DT's services that have not been completed to-date. EMC even made an investment in tooling and provided payment for components to be used for manufacturing – a commitment that EMC was not required to make under the MSA but nonetheless made in response to DT's premature and deceptive assurances. Even though EMC has done its part under the MSA and more, DT failed to comply with the MSA.

38.     The MSA requires DT to provide Services to develop Work Product, which includes Deliverables, to EMC. MSA Sec. 1.4, 1.7-1.9, 2.1. The Deliverables and services include the design, creation, and engineering of hardware, firmware, other software, and technical documentation, as specified in the accompanying SOWs.

Most importantly it requires the Deliverables to work and meet EMC's specifications in order to be marketable. *Id.*

39.    The MSA requires DT to transfer to EMC (as Work Product) all Deliverables, and associated intellectual property rights in the Deliverables. MSA Sec. 1.9. The MSA also provides EMC with the right to make modifications or derivatives of the Work Product. MSA Sec. 1.5.

40.    As described in more detail below, DT has breached the MSA by, *inter alia*, creating an unworkable and non-compliant product design that requires substantial software and firmware revisions and modification of hardware in order to function properly under EMC's specifications and meet the applicable UL requirements.

41.    Among other things, DT has failed to design and engineer a product that reliably tests emergency lighting per life safety code, which was the primary purpose of the MSA, as expressed in the SOWs.  DT has also failed to produce all Deliverables, and those Deliverables that DT has produced are incomplete, inaccurate, and unusable.  Additionally, DT repeatedly misrepresented the work it performed.

42.    In addition to DT's numerous breaches of the MSA, several of which are detailed below, DT has also been engaging in bad faith, duplicitous, unlawful, willful, and extortive conduct directed at EMC.  Examples of DT's misconduct include:

- DT provided EMC with a version of source code that was redacted to remove what DT claims is its "DT intellectual property".  DT, however, redacted basic product features, such as build files including amake, cmake and Simplicity Studio project files, rendering the files turned over to EMC completely useless.  By doing so, DT breached the MSA by making it exceedingly difficult to compile and run the firmware.  Further, it is impossible without the build files (absent extensive, time-consuming and expensive analysis) to determine if any source code files are missing from the production.

- DT intentionally withheld Deliverables owed to EMC under the MSA in a baseless attempt to force EMC to enter into a

manufacturing agreement with DT.  Even as recently as a meeting on March 8, 2022, organized to migrate EMC's cloud infrastructure under the MSA, DT commenced the meeting with a proclamation that the migration would be put on hold until a new SOW and manufacturing contract were negotiated between the parties.

- DT provided EMC with incomplete, incorrect technical specifications, thereby making it impossible for EMC to manufacture the correct hardware without manually recreating documents that DT promised to create and produce as Deliverables under the MSA.

- EMC had communicated that all requirements are needed in order for EMC to launch and support the Product.  DT responded by just providing a partial list.

43.     The MSA requires DT to develop a product for EMC that works and to turn over all Deliverables to DT, including the source code for all firmware and software, and design files for circuit boards and circuit-board assemblies that DT developed for EMC under the associated SOWs.

44.     Under the MSA, among other things, EMC owns the source code of the firmware and other software, and the design files for circuit boards and circuit-board assemblies, as EMC Intellectual Property because such source code and design files are Work Product  that was conceived, developed, designed, made, or reduced to practice by Darwin Tech for EMC during the Term of the Agreement pursuant to a Statement of Work. MSA Sec. 1.5, 1.9.

45.     Defendants attempted to withhold portions of the firmware source code under the guise that the source code somehow constitute "DT intellectual property." This attempt to withhold the source code is meritless as DT created the firmware for EMC based on EMC's own specifications under the MSA for a product that is the first of its kind and DT is obligated to turn over the firmware under the MSA.

46.     In addition, to the extent that any of the wrongfully-withheld firmware files could possibly be described as "DT intellectual property," and there is no

evidence that this is the case, DT is obligated to turn over all Deliverables and Work Product to EMC.

47.     Defendants' overall conduct, some of which is described herein, coupled with their numerous misrepresentations, ongoing delays, withholding of native files for PCB layout, and refusal to fix bugs, all constitute unequivocal evidence not only of DT's myriad material willful breaches of the MSA but also of Defendants' bad faith.  Defendants have been unable or unwilling to perform critical services required by the MSA, resulting in extensive project delays.

48.     Monetary damages are an insufficient remedy for the harm to EMC, which Defendants have caused.

49.     DT is liable to EMC for, *inter alia*, the willful breaches of the MSA described herein.  DT will remain fully liable for said willful breaches even after EMC terminates the MSA under § 8.4 since many of the breaches have already occurred and since DT's liability has already accrued.

50.     EMC estimates that it will cost well in excess of $2 million to resolve all the issues caused by DT's myriad willful breaches of the MSA and related misconduct.  EMC is in the process of resolving these issues at this time and incurring the associated costs.

51.     During the course of EMC's several unsuccessful attempts to obtain the Deliverables from Defendants and its myriad attempts to resolve this dispute, Defendants not only consistently refused to turn over the source code and related materials but continued to delay by suggesting that the Parties engage in discussions prior to participating in a mediation, refusing to resolve the key issues, delaying EMC's attempts to resolve the dispute so that it could use the Deliverables to produce the product that Defendants are unwilling and unable to provide.

52.     Defendants improperly conditioned the turnover of the firmware that is required to be turned over under the MSA, and any further product development work (for which EMC was ready, willing and able to pay) on EMC's agreement to enter

into a new separate manufacturing agreement with DT that Defendants knew EMC would not and could not agree to as a result of DT's failure to perform under the MSA.

53.     As a result of DT's ongoing willful breaches of the MSA, which are continuing to severely damage EMC's business, EMC repeatedly demanded that DT not go forward with its unilaterally-stated plan to assemble products using components that DT had in stock, instead of shipping EMC the specific components that EMC had demanded.

54.     Any products that DT would assemble in accordance with its current faulty design, which as Defendants know is also non-complaint with the applicable UL standard, are completely unusable and would have to be destroyed since they would not have been manufactured under the required UL listing.

55.     Accordingly, EMC had no choice but to file the instant lawsuit at this time to fully protect and enforce its rights.  By that time it had become clear that Defendants not only had no intention of working in good faith to resolve the myriad disputes between the Parties, but also that Defendants would continue to actively undermine all such attempts and delay any resolution of the dispute, knowingly causing irreparable harm to EMC.

**<u>CLAIM NUMBER ONE</u>**

**Breach of Contract Against Defendant DT and DOES 1-100**

56.     EMC incorporates by reference Paragraphs 1-55 as though fully set forth herein.

57.     The Parties entered into the MSA, a valid and enforceable agreement on or about July 15, 2020, and incorporated various Statements of Work ("SOWS") within the MSA.

58.     EMC has fulfilled all obligations owed of it under the MSA, including, the obligation to cooperate and the obligation to pay DT pursuant to the terms of the MSA.

59.     DT committed numerous willful breaches of the MSA, in part as reflected by obligations set forth in one or more of the SOWs incorporated into the MSA, including, *inter alia*, as follows:

(1)     Firmware is not feature complete as required by the Base System SOW and PRD:

    (a)     Over 40 feature tickets still not completed as of April 2022 - most tickets date back to 'Q2 and 'Q3 2021;

    (b)     Basic function – running monthly and annual tests – do not reliably run on a schedule automatically;

    (c)     Test results are unreliable (i.e.;, same fixture will return pass and fail);

(2)     Complete firmware, with all features, not been provided by contractual due date per Base System SOW and MVP SOW:

    (a)     Due by February 2021 under Base System SOW;

    (b)     Due by October 2021 under MVP SOW;

(3)     Reports do not satisfy NFPA 101 Emergency Lighting Test Requirements per PRD;

(4)     Mobile app does not meet terms of Mobile App SOW and MVP SOW:

    (a)     Not iTunes supported;

    (b)     Not Google Play store supported;

    (c)     EMC cannot manage and distribute either app; and

    (d)     Cannot create .csv report files from the app

(5)     Regulatory listing was not completed per terms of PRD:

    (a)     UL 244A listing never achieved

(6)     Embedded web portal does not meet terms of Base System SOW and PRD:

    (a)     Cannot change name of gateway and/or node in the web portal;

    (b)     Javascript files have not been provided;

(7)     All technical specifications and drawings related to Dock have not been produced or provided per MSA and PRD:

    (a)     DT claims the Dock is their IP and has refused to provide anything

1       related to it in breach of the MSA;

2   (8)   All native files for technical specifications have not been provided per
3         MSA, and Base System SOW:

4         (a)   Specifically, Altium files (.sch, .schdoc, etc.) for the PCB;

5   (9)   System does not support 200 nodes per Gateway per PRD:

6         (a)   DT has stated it will only support 100 nodes per Gateway and DT
7               has failed to provide any documentation to prove 200 nodes let
8               alone 100;

9   (10)  Cloud features are not functional per MVP SOW, ELT Software
10        Requirements, and ServiceChannel SOW:

11        (a)   System dashboard does not function correctly;
          (b)   Links such as "Edit User" do not work;
12        (c)   ServiceChannel integration does not work and is feature
13              incomplete;
          (d)   Report Library is unfinished;
14        (e)   Compliance reports are not organized and sortable as required;
15        (f)   User customized alerts does not function;
          (g)   One-time testing setting change has not been built;
16
17  (11)  The device lacks a removable micro-SD card that contains a back-up of
          compliance reports per Base System SOW:
18
19        (a)   USB-A, alternative set forth in PRD, does not work because it is
                not accessible due to gateway design;

20  (12)  DT failed to demonstrate that hardware meets environmental conditions
21        set forth in PRD;

22  (13)  DT failed to provide documentation routinely generated in the industry
23        (i.e., work for hire) such as flow charts, architecture drawings,
          communication protocol documentation;
24
25  (14)  DT Failed to provide information about tooling per Base Scope SOW:

26        (a)   Specific location;
          (b)   Compatibility requirements;
27        (c)   Basic specifications;
28        (d)   Technical documentation; and

(15)   DT breached the warranties set forth in the MSA.

60.   For all relevant time periods, Defendants were fully aware that EMC intended to use the Deliverables, Work Product, and related materials which DT was contracted to provide under the MSA to develop and sell Product.  Defendants were also fully aware for all relevant time periods that any delay in the provision of the Deliverables and Work Product would severely damage EMC's business through, *inter alia*, lost sales, revenue and customers.

61.   In addition to willfully breaching the MSA as listed above, DT breached the MSA by, *inter alia*: (1) delaying the turnover of Deliverables, Work Product, and other materials as required by the MSA knowing that such delays would substantially harm EMC in its business; (2) repeatedly misrepresenting material facts to EMC regarding, *inter alia*, its progress on the materials DT is responsible for creating pursuant to the terms of the MSA; misrepresenting the status of UL approval of various aspects of the project; (3) attempting to require EMC to enter into a new manufacturing agreement in exchange for compliance with the terms of the MSA; (4) failing to obtain the requisite UL Listing certification; and (5) refusing to negotiate the resolution of the issues created by its ongoing myriad breaches of the MSA in good faith

62.   For all of the reasons alleged herein, and based on the facts alleged herein, Plaintiff's relationship with Defendants is no longer workable and cannot be salvaged.

63.   EMC seeks compensatory damages from DT in excess of $2 million as a result of DT's breaches of the MSA, including, *inter alia*, damages associated with the substantial expenses incurred by EMC for retention of substitute contractors to recreate the Deliverables and Work Product, damages associated with substantial and ongoing lost profits, recovery of the money paid to DT.

64.   EMC seeks specific performance of the MSA, requiring that DT turn over all of the firmware and software source code, as well as the design files for

1  circuit boards and circuit-board assemblies that it is required to turn over per the terms

2  of the MSA.

3      65.    The MSA contains an attorneys' fee provision that provides for

4  attorneys' fees solely to DT and solely in the event that EMC is found to have been,

5  *inter alia*, grossly negligent or acted with willful misconduct.  [*See* MSA, § 10.3.,

6  Exh. "1".]  Under relevant California substantive law and public policy under relevant

7  law, including *Civil Code* § 1717, this provision is bilateral.  EMC is therefore entitled

8  to recover all reasonable party attorneys' fees incurred as a result of DT's breaches of

9  the MSA as DT's conduct was grossly negligent and/or DT acted with willful

10  misconduct.

## CLAIM NUMBER TWO

### Breach of The Implied Covenant of Good Faith and Fair Dealing Against Defendant DT And Does 1-100

14      66.    EMC incorporates by reference paragraphs 1 through 55 by reference as

15  though fully set forth herein.

16      67.    In every contract there exists an implied covenant of good faith and fair

17  dealing.

18      68.    DT has breached the implied covenant of good faith and fair dealing

19  contained within the MSA by, *inter alia*, failing to turn over source code and design

20  files for circuit boards and circuit-board assemblies as required by the MSA, failing to

21  advise EMC as to the status of the project, falsely reporting the status of the project,

22  and seeking to withhold compliance with the MSA until EMC agreed to enter into a

23  manufacturing agreement.

24      69.    EMC has performed all conditions, covenants and promises required to

25  be performed on its part in accordance with the terms and conditions of the MSA.

26      70.    As a direct and proximate result of DT's numerous breaches of the

27  implied covenant of good faith and fair dealing contained within the MSA, EMC has

28  been damaged in an amount to be determined at trial, an amount to be proven by the

trier of fact.

71.   EMC seeks compensatory damages from DT in excess of $2 million as a result of DT's breaches of the implied covenant of good faith and fair dealing contained within the MSA, including, *inter alia*, damages associated with the substantial expenses incurred by EMC for retention of substitute contractors to recreate the Deliverables and Work Product, damages associated with substantial and ongoing lost profits, recovery of the money paid to DT.

72.   EMC seeks specific performance of the MSA based on DT's breaches of the implied covenant of good faith and fair dealing contained within the MSA, requiring that DT turn over all of the source code and design files for circuit boards and circuit-board assemblies that it is required to turn over per the terms of the MSA, including all source code.

73.   The MSA contains an attorneys' fee provision that provides for attorneys' fees solely to DT and solely in the event that EMC is found to have been, *inter alia*, grossly negligent or acted with willful misconduct.  [See MSA, § 10.3., Exh. "1".]  Under relevant California substantive law and public policy under relevant law, including Civil Code § 1717, this provision is bilateral.  EMC is therefore entitled to recover all reasonable party attorneys' fees incurred as a result of DT's breaches / willful breaches of the implied covenant of good faith and fair dealing contained within the MSA as DT's conduct was grossly negligent and/or DT acted with willful misconduct.

## **CLAIM NUMBER THREE**

### **Declaratory Relief Against Defendant DT and Does 1-100**

74.   EMC incorporates by reference Paragraphs 1-55 as though fully set forth herein.

75.   As set forth herein, EMC fulfilled, if not exceeded, its contractual obligations under the MSA.

76.   As set forth herein, DT breached the MSA and the implied covenant of

good faith and fair dealing contained within the MSA by, inter alia, failing to turn over source code and design files for circuit boards and circuit-board assemblies as required by the MSA, failing to advise EMC as to the status of the project, falsely reporting the status of the project, and seeking to withhold compliance with the MSA until EMC agrees to enter into a manufacturing agreement.

77.    An actual controversy exists among the parties as to, among other things, whether DT is required to turn over all aspects of the source code and design files for circuit boards and circuit-board assemblies it promised to turn over in the MSA.

78.    EMC seeks a judicial declaration that the MSA, including its incorporated SOWs, require DT to turn over all aspects of the source code and design files for circuit boards and circuit-board assemblies it promised to turn over in the MSA.

## CLAIM NUMBER FOUR

### Unjust Enrichment Against All Defendants and Does 1-100

79.    EMC incorporates by reference Paragraphs 1-55 as though fully set forth herein.

80.    Defendants have received substantial monetary payments from EMC for work and services that were not performed and has wrongfully retained source code and design files for circuit boards and circuit-board assemblies and other materials that belong to EMC.

81.    Defendants have been unjustly enriched because Defendants have unjustly retained these benefits at the expense of EMC as Defendants were paid for services that were not performed and Defendants have wrongfully retained source code and design files for circuit boards and circuit-board assemblies and other materials that belong to EMC.

82.    EMC did not permit Defendants to retain such monetary payments for the withheld source code and design files for circuit boards and circuit-board assemblies, and other materials.

83.    EMC seeks the reasonable value of as restitution of the benefits unjustly retained by Defendants in an amount to be proven at trial but that is in excess of $2,000,000.00, plus interest and costs.

## CLAIM NUMBER FIVE

### Conversion Against All Defendants and Does 1-100

84.    Paragraphs 1 through55 are incorporated herein by reference as though fully set forth herein.

85.    EMC has ownership of and right to possession of all the source code and design files for circuit boards and circuit-board assemblies, and other Deliverables and Work Product developed and/or created by DT under the MSA, including all EMC Intellectual Property as those terms are defined in the MSA.

86.    Defendants converted the source code and design files for circuit boards and circuit-board assemblies and other Deliverables and Work Product owned by EMC by wrongfully withholding such materials from EMC in contravention of the MSA and EMC's rights.

87.    As a proximate result of Defendants' conversion of the source code and design files for circuit boards and circuit-board assemblies, and other deliverables by refusing to turn them over to DT as required by the MSA, EMC has suffered compensatory damages of in excess of $2 million;

88.    Defendants, and each of them, acted fraudulently, maliciously and oppressively with a conscious, reckless, willful, and/or with callous disregard of the probable detrimental and economic consequences to EMC, and to the direct benefit of these Defendants, knowing that their conduct was substantially certain to vex, annoy and injure EMC; EMC is entitled to punitive damages under California *Civil Code* §3294, in an amount sufficient to punish or to make an example of their conduct.

## CLAIM NUMBER SIX

### Fraud Against All Defendants and Does 1-100

89.    Paragraphs 1 - 55 are incorporated herein by reference as though fully set

forth herein.

90.     Defendants fraudulently induced EMC to enter into the MSA by falsely representing their background and experience.  EMC primarily communicated with DT by and through Whitney.  Defendants fully understood that EMC is a successful company with a long track record of success and well-established relationships with its customer base.  Further Defendants understood that EMC was reliant upon Defendants represented expertise, and needed the Deliverables and Work Product for bringing the Product to market.  Defendants' falsely represented their engineering and manufacturing capabilities and facilities.

91.     For example, in an email dated June 1, 2020 from Defendants, in response to specific inquiries by EMC regarding DT's capabilities, Whitney stated "We have many manufacturing partners in Asia" and "We have the ability but do not manufacture in the US/Mexico," suggesting that DT has access to different manufacturers. In fact, after relying on these representations, EMC learned that DT had an exclusive relationship with one particular Asian manufacturer, and no ability to manufacture in the US.

92.     During early conversations in 2020, Defendants made one or more representations leading EMC to believe that DT operated an office with research-and-development facilities in Irvine, CA. EMC relied on such representations to select and entrust DT to design the Product.  For example, in an email dated August 9, 2021, responding to EMC's request to visit DT's offices, Whitney stated "We maintained an office in Irvine until late last year." In fact, EMC has found no evidence of DT ever having commercial office space. DT's registered address in its Articles of Organization filed February 20, 2015 with the California Secretary of State identified the address of 13 Bear Paw, Apt. 15A, Irvine, CA 92604. This is a residential address.

93.     Statements of Information filed by Defendants in 2018 indicate that Whitney had moved his residence (and DT's address) to Big Bear Lake by that time, long before Covid.  EMC has since discovered that DT is now located in Whitney's small mountain house located in Big Bear, California:



This is clearly not a viable location for an electronics engineering and manufacturing business.  Defendants' inability to comply with the terms of the MSA became apparent during the course of the parties' relationship.

94.     EMC relied on these false representations, among others, to enter into the MSA.  EMC would not have entered into the MSA had EMC known the true facts.

95.     Defendants also fraudulently misled EMC throughout the course of the parties' contractual relationship as alleged above by failing to timely communicate with EMC as required by the MSA and the implied covenant of good faith and fair dealing contained within the MSA.  Defendants failed to, *inter alia*, timely disclose the fact that the products they were creating failed to pass UL testing or the lack of progress on the development.

96.     On September 2, 2021, UL advised Defendants that UL declined DT's request to perform UL certification services for the Product.  As noted above, DT

falsely represented to EMC for over six weeks orally and in writing that the UL evaluation was ongoing when in fact it was not, while at the same time securing additional funding from EMC for the nonexistent UL certification procedures.  For example, on September 29, 2021, in response to inquiry from EMC, Whitney stated "As of last night the UL team is reviewing the documentation. I am expecting an update from them again today on any further questions." In fact, the communication from UL consisted of a 1-page letter from weeks earlier containing a clear refusal to provide UL certification services for the Product. Although Defendants could have (and should have) shared the September-2 correspondence from UL with EMC soon after receipt early in September, Defendants did not do so. Although Defendants could have (and should have) responded to EMC's inquiry on September 29 when Defendants clearly knew about the adverse answer from UL, Defendants failed to do so. Defendants only informed EMC about UL's refusal to provide certification services on October 19, 2021, which more than 6 weeks after learning this information. During this time, EMC lost precious time to seek alternative solutions while continuing to rely on DT's representations that UL information was still forthcoming.

97.    The withholding of critical UL-certification-denial information by Defendants occurred while Defendants knew or should have known that EMC had made commitments to customers about product availability based on product-delivery schedules. In an email communication dated July 14, 2021, EMC informed Defendants about the urgency of product deliveries. Defendants knew or should have known that UL certification was needed prior to shipment of Product to the US.

98.    Defendants did not at any time advise EMC that they simply could not manage through the product-certification challenges or otherwise deliver on the MSA. Nor did Defendants advise EMC that they never intended to turn over all of the source code and design files for circuit boards and circuit-board assemblies and related Deliverables and Work Product as required by the MSA.  Instead they strung EMC

along continuing to seek and accept payments under the MSA, as well as other payments for setup of manufacturing despite the failure to deliver under the MSA and the fact that they knew they would never be able to deliver.

99.    EMC reasonably relied on these misrepresentations by, *inter alia*, continuing to pay DT and by not terminating the MSA sooner so that it could retain a competent company to redo the work that Defendants promised they could do but did not and could not deliver.

100.    As a proximate result of Defendants' misrepresentations and omissions, EMC has been damaged in an amount to be proven at trial but that is in excess of $2 million.

101.    Defendants, and each of them, acted fraudulently, maliciously and oppressively with a conscious, reckless, willful, and/or with callous disregard of the probable detrimental and economic consequences to EMC, and to the direct benefit of these Defendants, knowing that their conduct was substantially certain to vex, annoy and injure EMC; EMC is entitled to punitive damages under California *Civil Code* §3294, in an amount sufficient to punish or to make an example of their conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, EMC prays for relief as follows:

A.    For the first and second causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, compensatory damages according to prof, costs of suit, prejudgment and post-judgment interest on all awards, for injunctive relief requiring that DT turn over to EMC all firmware and related materials wrongfully retained, , reasonable attorneys' fees and further relief as the Court deems proper.

B.    For the third cause of action for declaratory relief, for a declaration as to DT's obligations under the MSA, including, *inter alia*, the obligation to turn over all firmware and other deliverables to EMC, prejudgment and post judgment interest in

an amount to be determined by the Court, reasonable attorneys' fees and further relief as the Court deems proper.

C.     For the fourth cause of action for unjust enrichment, compensatory damages according to proof, costs of suit, restitution, punitive damages and prejudgment and post-judgment interest and for such other and further relief as the Court deems proper.

D.     For the fifth cause of action for conversion, compensatory damages in an amount fraud cause of action, compensatory damages in  amount to be determined by the trier of fact, and exemplary and punitive damages in an amount to be determined by the Court.

E.     For the sixth cause of action for fraud, compensatory damages in an amount fraud cause of action, compensatory damages in the amount of amount to be determined by the trier of fact, exemplary and punitive damages in an amount to be determined by the Court and further relief as the Court deems proper

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial.


Dated:  May 9, 2022                              COZEN O'CONNOR


                                        By:/s/Erik L. Jackson_____
                                        Erik L. Jackson
                                        Attorneys for Plaintiffs